**UNITED STATES DISTRICT COURT**
**IN AND FOR THE SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RAMON CEJA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3-98-CR-00068<br><br><br><br>**REPORT AND RECOMMENDATION** |

Pursuant to the order entered on July 14, 2006 by District Judge James E. Gritzner, the undersigned United States Magistrate Judge submits the following Report and Recommendation regarding the Petition for Revocation of Supervised Release (Clerk's No. 145), filed July 7, 2006, and to which an addendum was filed, also under seal, on July 13, 2006 (Clerk's No. 154).

Defendant was arrested on warrant on July 7, 2006, and had an initial appearance on July 10, 2006, at which time a detention hearing was set for July 12, 2006. See, Minute Entry (Clerk's No. 149).

Upon motion of the defendant on July 12, 2006, the detention hearing was continued until the time for hearing on the issues of revocation of supervised release on July 14, 2006, before Judge Gritzner. See, Minute Entry (Clerk's No. 152).

Because of technical and logistical difficulties, the evidentiary hearing scheduled for July 14, 2006 on the Petition and the Addendum to Petition for Revocation of Supervised Release were continued by Judge Gritzner to July 17, 2006, for purposes of this Report and Recommendation.

BACKGROUND

Ramon Ceja (Ceja) was convicted of conspiracy to distribute cocaine base (crack) in violation of 21 U.S.C. § 846, and use and carry of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). On January 15, 1999, then Chief Judge Charles R. Wolle sentenced

him to a period of imprisonment of 87 months on the conspiracy charge, and a 60-month term of imprisonment on the firearm charge, to be served consecutively. See, Judgment filed January 15, 1999 (Clerk's No. 88). Thereafter, it appears from the docket, that Ceja's sentence was modified by order of the Court, resulting in a period of imprisonment of 68 months, followed by a 48-month period of supervised release. Ceja began his supervised release on December 10, 2002.

Defendant has been supervised by the United States Probation Office in Davenport. His period of supervised release was unremarkable until May 10, 2004, when Timothy F. Heinrichs, United States Probation Officer, submitted a written report to Judge Gritzner regarding noncompliance by Ceja with the terms of his supervised release. That report specifically detailed domestic assault charges filed against Ceja in Rock Island County, Illinois Circuit, arising out of an October 3, 2003 incident involving defendant and an ex-girlfriend. The nature of that incident, and the charges being filed, were not discovered by the probation office until November 20, 2003, at which time it also learned of a September 11, 2003 incident involving the same victim.

During a meeting between Probation Officer Heinrichs and Ceja on November 21, 2003 Ceja admitted that he had contacts with police officers on September 11, 2003 and October 2003, but he did not report those to the probation officer because Ceja believed he only had to report arrests. It should be noted that Ceja was not convicted of either the September or the October alleged assaults.

On September 27, 2005, Probation Officer Heinrichs again filed a written report with the Court (Clerk's No. 145), in which he advised the Court that on May 22, 2005, Ceja was charged with domestic assault in Bettendorf, Iowa, arising out of a May 21, 2005 incident. An order of protection was also entered against Ceja, but after a trial in the Iowa District Court for Scott County on August 4, 2005, Ceja was found not guilty.

Notwithstanding Ceja's earlier claim that he did not know he was supposed to advise the probation office when he had contact with law enforcement officers, he again advised the probation officer that he mistakenly believed he needed to only report actual arrests, not a citation. The probation officer recommended no action be taken against Ceja as a result of these incidents.

The filing of the Petition for Revocation of Supervised Release, and the addendum, now the subject of this Report and Recommendation, incorporated the prior notices to the Court of noncompliance with the terms of supervised release by Ceja, and also detailed an October 11, 2005 alleged assault by Ceja upon Alyssa A. Cameron. Cameron and Ceja were cohabiting, and it was alleged that Ceja hit Cameron in the mouth, cutting her lip, and struck her in the back of her head with a concrete statue, requiring emergency medical treatment, including stitches. Charges were filed against Ceja as a result of that incident, but were dismissed on February 2, 2006 because no witnesses arrived for the final pretrial conference in the Scott County, Iowa District Court.

The petition for revocation also detailed a July 3, 2006 incident, again involving Cameron and Ceja. Cameron was interviewed by a member of the Galesburg, Illinois police department at Cottage Hospital in Galesburg after she appeared at the hospital at 6:00 a.m. for emergency treatment. The petition alleged that Cameron admitted a physical altercation with Ceja earlier that day in Bettendorf, following which Cameron drove herself and her infant child to her aunt's home in Galesburg. It is alleged in the petition that Cameron sustained stab wounds on her right hand and left elbow, as well as other scratches and bruising on her body. The Galesburg, Illinois police department notified the Bettendorf, Iowa police department of the incident, and the probation office was notified by the Bettendorf police department regarding Ceja's possible involvement in this matter.

The addendum to the petition for revocation alleges that as a result of the September 11, 2003 incident, Ceja failed to notify the probation office within 72 hours of being questioned by the law enforcement officers, and failed to note that contact on his September 2003 written monthly report. The addendum also alleges that Ceja failed to notify the probation office within 72 hours of being questioned by law enforcement officers as a result of the October 3, 2003 incident, and did not report that contact on his written monthly report for October 2003.

The addendum also alleges that Ceja did assault and stab Cameron on July 3, 2006, after a domestic argument, and noted that Cameron was refusing to cooperate with the probation office regarding the petition to revoke supervised release.

## THE HEARING

Defendant appeared in person, and with his attorney Michael Galvin, at the evidentiary hearing on July 17, 2006. Assistant United States Attorney Donald Allegro appeared for the government, along with Probation Officer Timothy Heinrichs.

The parties made no opening statements, and made no closing arguments.

The government called ten witnesses. It also offered into evidence Exhibits 1, 2, 3, 4, 5; 16A, B, C, D, E, F, G, N, O, P and Q; 18, 20 and 22.

Exhibits 3, 4; 16A, B, C, D, E, F, N, O, P and Q; 18, 20 and 22 are all photographs. Exhibit 16G is a statue that was identified as being an object used to strike Alyssa Cameron on October 10, 2005. Exhibit 1 is Ceja's acknowledgment of his supervised release requirements; Exhibit 2 is Ceja's written monthly supervision report for October 2003, and Exhibit 5 was a copy of a Verified Petition for Protective Order filed by Jessica Defrieze in the Fourteenth Judicial Circuit, Rock Island County, Illinois on November 18, 2003.

Ceja called no witnesses on his behalf, and offered no exhibits.

The testimony of each of the witnesses is summarized as follows, and in order of their appearance:

1. William Braschae. Braschae is a sergeant with the Silvis, Illinois police department, and has 19 years experience. He responded on October 3, 2003, to an early-morning call from a third person regarding alleged domestic abuse upon Jessica Defrieze at her residence. Braschae responded to the call with Officer David Rice, and found Defrieze, Ceja and another person at Defrieze's home at 1216 12th Street, Silvis, Illinois. Braschae spoke with Defrieze, and noted that her right eye was swollen shut, and that she had evidence of other injuries, including blood on her face. She said she had been battered in the Rock Island District, but did not disclose by whom. Braschae felt that Defrieze was not cooperative; she refused to identify her assailant. Braschae noted that he did not believe her statements.

Ceja was at the residence, along with a red Camero, which he had been driving. Braschae stated that an examination of the vehicle showed that there was saliva and blood on the car's windows, and on the ground around it. Braschae further stated that Defrieze denied that Ceja was her assailant. Braschae found no evidence of injuries to Ceja.

2. Officer Jon Castro is also a member of the Silvis, Illinois police department, with 17 years experience. He interviewed Defrieze later on October 3, 2003, at 1:00 p.m. in order to complete the investigation. At that time, he observed injuries to both of Defrieze's eyes, although noted that her right eye was worse, almost closed at that time. He stated that Defrieze told him she wanted to tell the truth, and to get accurate information about the assault. Castro testified that Defrieze told him that she and Ceja were at a bar in the Rock Island District when Ceja got into a fight

with a third person. After that, on their way out of the District, she claimed that Ceja assaulted her in the car, and then later at her house. She told Castro that she feared for her safety, so she did not tell the officers who initially investigated the assault what had happened. Castro had the injuries to Defrieze photographed. See Exhibits 3 and 4.

3. Officer Shawn Claussen is a police officer with the Bettendorf, Iowa police department. He has two years experience with that department. Claussen testified that on May 22, 2005, he was called to 2705 Hawthorne Drive, Bettendorf, Iowa, in response to a call regarding an assault. When he arrived at the residence he found Ceja and Defrieze both there. He examined Defrieze and found no injuries, although he did speak with her. She told him that Ceja came to the apartment to pick up his clothes, and became upset when he found that she had delivered them to a third person, apparently in retaliation for Ceja's spending the evening with another woman. Claussen testified that Ceja arrived at her apartment, and began kicking and beating on the apartment door, so she let him inside. Once inside, she claims Ceja grabbed her around the neck, and began pushing her around. Two other individuals were there at the time, although they left before Claussen arrived. They returned to the apartment, and confirmed Defrieze's version. Claussen cited Ceja at that time, but did not arrest him.

4. Officer Brian Crouch is also with the Bettendorf police department. He responded to a call to the Trinity Terrace Park Emergency Room on October 10, 2005, where he was directed to Alyssa Cameron. Cameron reported to Crouch that she had been beaten by her boyfriend. Crouch observed Cameron had a cut on her nose, a cut on the back of her head, and a bleeding lip. At that time, Cameron also told Crouch that she and her boyfriend had been living together for approximately one month. She further stated that her boyfriend had been drinking, left the house, and then returned,

and later hit her with a closed fist, grabbed her by her hair, and then hit her in the back of her head with a cement statue. Crouch was present when photographs were taken in the emergency room of Cameron, and those were admitted into evidence. See, Exhibits 16A, B, C, D, N, O, P and Q. He described those photographs as accurately depicting Cameron's condition in the emergency room.

Crouch was also given the cement statue that Cameron described in the emergency room as being the weapon used to hit her in the back of the head. That statue was obtained by another member of the Bettendorf police department from Cameron's apartment, although Crouch was not present when it was collected. Exhibits 16E and F are photographs of the statue inside Cameron's apartment.

5. Officer Ashley Guffey is also with the Bettendorf police department. She was called to the Trinity Emergency Room on October 10, 2005, and met with Cameron. Guffey described Cameron as shaken; she had a cut on her lip, an injury to her nose, and a cut on the back of her head. She did not interview Cameron, but did go later to Cameron's apartment at 2505 Devils Glen Road in Bettendorf. At that time she found blood stains on the outside deck and steps to the apartment. No one was present within the apartment, so she did not go inside. She did take photographs of the blood stains found outside the apartment, and they were admitted as Exhibits 16 I, J, K, L and M. Guffey was given the statue that Cameron described, and which was admitted as Exhibit 16G, and she took it to the Bettendorf police department to be held as evidence.

6. Alyssa Cameron. Cameron described Ceja as her boyfriend of approximately two years. They met at work, and have lived together for approximately one year. They have one child.

Cameron testified that Ceja has never assaulted her. She admitted that on October 10, 2005, when she told Bettendorf police officers that Ceja has assaulted, that that was "kind of true."

She claimed to have received a cut on the back of her head at that time, but no recall of having a cut on her lip or her nose. She then testified that the cut on the back of her head occurred because she had an argument with Ceja over another woman. She claimed that she became angry and attempted to throw the cement statue at Ceja, but he was able to block it, and as a result she either dropped the statue or struck herself in the back of the head. She denied having any injury to her nose or her lip, explaining that the photographs that were taken did not depict injuries she received during that altercation.

Cameron was also asked about the July 3, 2006 incident, which resulted in her being treated for cuts at the Cottage Hospital in Galesburg, Illinois. Cameron admitted that she and Ceja had had a verbal argument the same day that she went to Galesburg. She went to the hospital because she felt the cuts were more serious that she originally believed, and felt that she might need stitches. Cameron admitted that Exhibits 18, 20 and 22 accurately depicted her condition while in the Galesburg hospital. She denies that any of the injuries she received on July 3, 2006 were caused by Ceja. Her explanation was that a glass of liquid exploded and fell on the floor, thus causing her to slip and fall. When she fell she claimed she received the serious lacerations to her right hand and upper left arm. She denied Ceja inflicted wounds that were shown in Exhibits 18, 20 and 22. She also denied telling Officer David Slater of the Galesburg police department that Ceja had stabbed her.

Cameron also denied telling Officer Crouch on December 10, 2005 that Ceja hit her with the statue, and pushed her in the face. She reiterated that Ceja accidentally caused the statue to fall and hit her on the back of the head when he was trying to stop her from throwing the statue at him.

Cameron stated under oath that the incidents on October 10, 2005 and July 3, 2006 were just accidents.

Cameron also denied failing to appear pursuant to a subpoena for trial on the October 10, 2005 assault charge brought against Ceja.

Cameron stated that after she was cut on July 3, 2006, rather that going to either Trinity Hospital in Bettendorf, near her residence, or Genesis Hospital in Davenport, she decided to go to Galesburg, which was on the way to her parents' home. As she drove to Galesburg, she determined that her injuries were worst than she had thought, and that was the reason that she had her aunt, Linda Anderson, take her to the Galesburg Hospital.

Cameron admitted that after going to the hospital, her aunt took her to a shelter for battered women, but denied that she went there because of any assaults upon her by Ceja; her reason for seeking help from the shelter was his "unfaithfulness."

Cameron also denied that Ceja attacked her with a knife on July 3, 2006, and denied telling Officer Slater that Ceja had stabbed her.

7. Linda Anderson is Cameron's aunt. Cameron's mother is her sister. She testified that on July 3, 2006, Cameron came to her home in Galesburg. Cameron rang the doorbell, and when Anderson opened the door she found Cameron standing there with a black eye, holding her left arm with a bloody towel. She brought Cameron into her home, and attempted to calm her down, and determined that she needed to go to the hospital for treatment of her wounds.

Anderson waited for Cameron while she was treated. She recalled that Cameron received stitches on her right hand, and staples for the two wounds on her upper arm near her left elbow. Anderson testified that at no time did Cameron ever tell her that she received the cuts on her arms from falling on broken glass in her kitchen.

Anderson recalled that a Galesburg police officer was called to the emergency room, and interviewed Cameron, although Anderson was not present for that interview.

After Cameron was released from Cottage Hospital, Anderson drove her back to her home, and then took her to the Safe Harbor Shelter for Domestic Abuse in Galesburg. She testified that Cameron wanted to go to the shelter. Anderson was present while Cameron was interviewed at the shelter, and overheard Cameron tell the receptionist that she had been threatened with death by gunshot. After Cameron was interviewed at the shelter, she returned to Anderson's home. Anderson testified that the shelter workers felt that she would be safe with Anderson at her home.

Anderson further testified that Cameron discussed the July 3, 2006 incident with Anderson and Anderson's husband on July 13, 2006, in Bettendorf Iowa, during a lunch meeting. At that time, according to Anderson, Cameron told her that she had stated that she fell on glass, and that if everyone would leave her alone "everything would be alright." Anderson recalled that Cameron made no mention of any names.

8. Officer David Salter is a member of the Galesburg police department. He testified by telephone because he is currently mobilized by the United States Army Reserves, and is stationed at Fort McCoy, Wisconsin. He testified over Ceja's objection, based on inability to confront the witness. The Court overruled that objection.

Officer Salter testified that on July 3, 2006, while on duty, he was called at 6:00 a.m. to the Cottage Hospital Emergency Room in Galesburg to interview a stab wound victim. He found Cameron there, and interviewed her. He said that she had three small stab wounds on her hands and arms, as well as a black eye and bruising on her face, which also contained dried blood. Salter recalled that Cameron told him that her boyfriend had stabbed her in Moline, but she refused to give

the name of her boyfriend, or her address. He stated that the assault occurred at 2:00 a.m. on July 3, 2006.

Cameron also told Salter during that interview that she had just moved to Moline several days before the incident, and she could not recall the address. She told Salter that she had been stabbed with a small knife, and after several hours she was able to retrieve her infant, and leave the apartment, and drive to her aunt’s home in Galesburg. Salter testified that Cameron told him nothing about falling on broken glass during that interview. He also recalled that Cameron had told him that her live-in boyfriend had moved with her to the Moline apartment, and that he had showed up before the stabbing.

9. Zachary E. Cameron. Cameron is Alyssa Cameron’s ex-husband. They were married in 1994, and divorced on July 13, 2006. He testified that they separated in November 2004. He was aware that Alyssa Cameron had a relationship with Ceja since December 2004 or January 2005.

He testified that Alyssa Cameron called him at 4:00 a.m. on October 10, 2005 in tears, asking for his help. She was in her car, calling with a cell phone. He recalled that at that time Alyssa Cameron told him that Ceja had hurt her, and in response he told her to go to the nearest hospital, which she did, and he met her in the emergency room of Trinity Terrace Park Hospital, Bettendorf, Iowa. At the emergency room, Cameron recalled that Alyssa Cameron told him that Ceja had grabbed her hair, and then hit her in the back of the head with a cement statue as she was attempting to leave her residence. Cameron also recalled that at no time did she ever tell him that she accidentally hit herself in the head with a statue.

10. Timothy Heinrichs, Senior United States Probation Officer. Heinrichs testified that he had supervised Ceja since approximately April 2003, when Ceja's original probation officer resigned.

Heinrichs identified Exhibit 1, which contained written documentation of instructions given to Ceja regarding the rules and regulations of his supervised release. Heinrichs also identified Exhibit 2 as Ceja's October 2003 written monthly supervision report, in which he denied that he had been questioned by police, even though that was the same month that Jessica Defrieze alleged an assault.

Heinrichs also identified Exhibit 5, which was the Verified Petition for Protective Order filed by Defrieze in the Rock Island County, Illinois Circuit Court on November 18, 2003, and which detailed in narrative form altercations between Defrieze and Ceja as alleged by Defrieze.

Heinrichs also testified that Ceja has submitted all required written monthly reports while on supervision, and that he has never tested positive for illegal substances in any urinalyses requested by the probation office. Heinrichs agreed that Ceja has told him that all his problems emanate "because women in his life hold his supervised release over his head."

## LEGAL STANDARDS

In considering the issues framed by the petition for revocation, and the addendum, the Court is guided by the provisions of 18 U.S.C. § 3583(e)(3), which provides in pertinent part that

> **(e) Modification of conditions of revocation.** -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4),(a)(5), (a)(6), and (a)(7) --

* * *

* * *

> (3) revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of ... supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release ...

The district court has discretion to revoke a supervised release if the government proves by a preponderance of the evidence that the defendant has violated a condition of that supervised release. U.S. v. Carothers, 337 F.3d 1017, 1019 (8th Cir. 2003) (citing 18 U.S.C. § 3583(e)(3),(g) (2000); United States v. Whalen, 82 F.3d 528, 532 (1st Cir. 1996) (cited in United States v. Reeves, No. 96-2905, 1997 WL 215381, at *1 (8th Cir. May 1, 1997) (unpublished)). Because this Court makes findings of fact as to the issues before it now, its fact finding is reviewed for clear error. U.S. V. Carothers, 337 F.3d at 1019; United States v. Whalen, 82 F.3d at 532.

Credibility determinations by the district court are "virtually unreviewable on appeal." U.S. v. Carothers, 337 F.3d at 1019; United States v. Hernandez, 281 F.3d 746, 748 (8th Cir. 2002).

The Circuit Court of Appeals reviews a district court's decision to revoke supervised release for an abuse of discretion. U.S. v. Ahlemeier, 391 F.3d 915, 919 (8th Cir. 2004), citing United States v. Carothers, 337 F.3d 1017, 1019 (8th Cir. 2003). Before the court revokes supervised release, the defendant is entitled to a revocation hearing. U.S. v. Ahlemeier, 391 F.3d at 919.

## FINDINGS OF FACT

Ceja's supervised release provides for a number of specific conditions. Among the pertinent ones are: defendant not commit another federal, state or local crime; defendant shall report to the probation officer and shall submit a truthful and complete written report each month; defendant

shall answer truthfully all inquiries by the probation officer; defendant shall refrain from excessive use of alcohol; defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.

The petition for revocation, which was filed under seal, alleged, *inter alia*, that Ceja violated state law by physically attacking Alyssa Cameron on October 10, 2005 and July 3, 2006, as well as the assault on Jessica Defrieze. (Defrieze, while under subpoena continued by Judge Griztner, failed to appear.)

The addendum to that petition alleges other noncompliance with the terms of the supervised release, including: failure to notify the probation officer within 72 hours of September 11, 2003 that Ceja was questioned by Davenport police officers; failing to notify the probation officer within 72 hours of Ceja being questioned by Silvis, Illinois police officers on October 3, 2003; and an October 11, 2005 assault, with physical injury, upon Alyssa Cameron.

The Court finds by a preponderance of the evidence that the allegations contained in the petition for revocation, including those contained in the addendum, have been established. Ceja has violated the terms of his supervised release by committing crimes in violation of the statutes of the states of Iowa and Illinois, namely physical assaults upon Jessica Defrieze and Alyssa Cameron. He has also failed to notify the United States Probation Office after being questioned about several of these assaults by both the Silvis, Illinois police department and the Bettendorf police department.

While Ceja presented no evidence, it is clear to the Court that the thrust of his resistance to the allegations against him was the testimony of Alyssa Cameron and the non-appearance by Jessica Defrieze. The Court found Alyssa Cameron's testimony to be totally without credibility

or merit. Her contentions that injuries she sustained on October 10, 2005, especially a large cut in her scalp which required medical treatment, and which she explained resulted when she either hit herself, or dropped a statue on her head as a result of defensive maneuvers by Ceja, is totally disingenuous.

Likewise, Cameron's explanation as to how she sustained puncture-type wounds on her right hand and left arm on July 3, 2006, and which required hospital treatment, is nothing more than a fabrication.

The testimony of Cameron's ex-husband, Zachary E. Cameron, about her statements to him regarding the October 10, 2005 incident, is more believable. She told him that she sustained the head wound when she turned her back on Ceja in an attempt to leave their apartment, and he struck her with the cement statue.

Likewise, the Court finds that Officer Salter's interview of Alyssa Cameron at the Cottage Hospital in Galesburg, Illinois on July 3, 2006, established the facts of that incident. Salter testified that based on his observations of the wounds sustained by Cameron, they were of a stabbing-type, with a small object. In addition, Salter testified without contradiction that Cameron told him that the wounds he observed upon her resulted from her boyfriend stabbing her. She told Salter that this assault occurred at an apartment in Moline, and in which she and her boyfriend had lived for only one day. She advised him that the assault occurred at approximately 2:00 a.m.

Cameron's testimony regarding the July 3, 2006 incident is totally unreliable. Her testimony that the injuries to her right hand and left arm occurred when a glass containing liquid "exploded," causing Cameron to fall and roll on the ground, is not truthful. All this occurred at approximately 2:00 a.m., and yet notwithstanding the fact that Cameron's Bettendorf apartment,

where she testified this incident occurred, was located within miles of Trinity Terrace Park Emergency Room, she elected to drive to Galesburg, Illinois, with her infant, where she was seen in the emergency room at 6:00 a.m. That testimony conflicts with her statements to Officer Salter that she was attacked in Moline, Illinois of her boyfriend.

In addition, the testimony of her aunt, Linda Anderson, while limited because of the reluctance of her aunt to question her about her injuries, nonetheless, further convinces the Court of the incredulity of Alyssa Cameron's testimony.

It is apparent to the undersigned magistrate judge that Alyssa Cameron is willing to perjure herself in an effort to prevent Ceja from having his supervised release revoked.

The Court's review of the testimony of the other investigating police officers from both Silvis, Illinois and Bettendorf, Iowa further establishes the violent nature of Ceja, and his apparent inability to refrain from assaulting women with whom he has romantic relationships.

The credibility of the investigating police officers was neither challenged nor questioned. The credibility of Zachary Cameron and Linda Anderson likewise was unchallenged.

RECOMMENDATION

Based upon the foregoing finding of facts, the undersigned magistrate judge recommends that the supervised release of Defendant Ramon Ceja be revoked, and that he be sentenced to serve a term of 24 months in prison, followed by a period of three years of supervised release, during which he shall not be permitted to cohabit with any person of the opposite sex; shall not be permitted to have in his possession, custody or control any type of dangerous weapon or device, including firearms; that he be required to enroll in, and successfully complete an anger management course and a program to prevent and control domestic abuse, and defendant shall comply with all standard

conditions of supervised release, as well as special conditions of supervision that the Court may impose at the completion of defendant's 24-month term of imprisonment.

The parties have to and including August 3, 2006, to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Wade for Robinson v. Callahan, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Such extensions will be freely granted. Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. See, Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994); Halpin v. Shalala, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); Thompson, 897 F.2d at 357.

Respectfully submitted,

Date: July 24, 2006

THOMAS J. SHIELDS
CHIEF U.S. MAGISTRATE JUDGE